RECEIVED
IN MONROE, LA

MAY 8 - 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

EPCO CARBONDIOXIDE PRODUCTS, INC.            CIVIL ACTION NO. 04-2324

VERSUS                                       JUDGE ROBERT G. JAMES

BANK ONE, NA, ET AL.                         MAG. JUDGE MARK L. HORNSBY

## RULING

Pending before the Court are a Motion for Summary Judgment and Amended Motion for

Summary Judgment filed by Defendant JPMorgan Chase Bank, NA, successor by merger to

Bank One, NA ("Chase") [Doc. Nos. 57 & 76], and a Motion for Summary Judgment [Doc. No.

77] filed by Plaintiff EPCO Carbondioxide Products, Inc. ("EPCO").

For the following reasons, Chase's Motion for Summary Judgment and Amended Motion

for Summary Judgment are GRANTED, and EPCO's Motion for Summary Judgment is

DENIED.

## I.    FACTS AND PROCEDURAL HISTORY

EPCO produces liquid carbon dioxide.  In order to acquire sites and manufacturing

equipment, EPCO obtains financing from banks in the form of letters of credit to secure "lower

floater" taxable and tax-exempt corporate note issuances.  Chase, through its predecessors, Bank

One and Central Bank[1], provided financing for three of EPCO's facilities at Eddyville, Iowa;

---

[1]The original financing and subsequent negotiations on restructuring were handled first by
Central Bank and then by Bank One.  However, Bank One was the successor by merger to
Central Bank, and Chase is the successor by merger to Bank One.  Therefore, Chase is the proper
Defendant in this case, and the Court will refer to "Chase" hereinafter, regardless of whether the
banking institution was then known as Central Bank, Bank One, or Chase.

Beaumont, Texas; and Sterlington, Louisiana.

On August 29, 1996, EPCO and Chase entered into a Commercial Loan and Security Agreement. [Doc. No. 57, Exh. C.]. The original agreement provided for financing for the purchase and installation of equipment and machinery for the Sterlington plant and for the issuance of an irrevocable standby letter of credit to Cargill, Inc., the seller of the equipment and machinery. [Doc. No. 57, Exh. C, p. 1[2]]. This Agreement was subsequently amended three times on February 1, 1997; December 11, 1992; and June 27, 2000, but each amendment stated that the original agreement remained in effect, except as modified.

On December 10, 1998, Chase issued an Irrevocable Standby Letter of Credit to EPCO for the benefit of the City of Kansas City, Missouri. [Doc. No. 57, Exhs. F & G].

On June 28, 2001, EPCO and Chase executed a Business Loan Agreement, which "governs all loans, credit facilities and/or other financial accommodations described [in the Agreement] and, unless otherwise agreed to in writing . . . .all other present and future loans, credit facilities and other financial accommodations provided by [Chase to EPCO]." [Doc. No. 57, Exh. B, p. 1].

In December 2002, EPCO and Chase entered into a financing agreement for the Eddyville facility. Chase agreed to issue an irrevocable direct pay letter of credit for $3,350,000 that would support floating-rate option notes issued by EPCO.[3] In return, EPCO executed Security

---

[2]All references to page numbers in the financial documents between the parties shall be the page numbers of the document itself, not the page numbering employed by the Court's CM/ECF system.

[3]As the Fifth Circuit has explained, relying on EPCO's petition, this so-called

"Lower Floater" financing is a security structure in which notes are underwritten

Agreements in which it granted Chase a security interest in various collateral relating to the
Eddyville facility. Some financing documents contemplated a subsequent issuance of notes up to
an aggregate amount of $7 million relating to the acquisition of future projects, including a
facility in Monroe, Wisconsin.

However, in early 2003, EPCO began experiencing financial difficulties. As a result, its
loans were transferred to the Managed Assets[4] Department, which handles problem loans. After
the transfer of the loans, EPCO requested modification of its loan agreements.

On March 19, 2003, Chase and EPCO executed a Forebearance Agreement [Doc. No. 57,
Exh. H] with a 180-day term, effective March 14, 2003.

On March 9, 2004, representatives for EPCO and Chase began negotiating modifications
to the agreements between the parties. Richard Broussard ("Broussard"), First Vice President for
Chase, is the account officer with personal responsibility for the lending relationship between
Chase and EPCO. On March 9, Broussard sent a letter to Eric Wiesemann ("Wiesemann"),
President of EPCO, stating that Chase was "agreeable" to Wiesemann's request to modify the
agreements subject to certain terms and conditions. [Doc. No. 57, Exh. A]. Wiesemann indicated

_____

and sold in the public finance market to investors who will rely on the letter of
credit as a source of repayment. The trustee of the letter of credit, Chase, will
make payments to the holders of the notes and can then seek reimbursement from
the debtor, EPCO, pursuant to the terms of a Reimbursement Agreement [Doc.
No. 57, Exh. A] signed by the parties.

EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase Bank, NA, 467 F.3d 466, 468 n.1 (5th
Cir. 2006).

[4]Chase has referred to the transfer of the loans to the "Managed Assets" and "Special
Assets" Departments. Regardless of the correct title, there is no dispute that EPCO's account
was transferred to another bank department for handling.

his assent to these terms and conditions by signing the letter. Therefore, EPCO and Chase entered into a written agreement under the terms set forth in the March 9, 2004 letter.

EPCO's bonds for its Beaumont, Texas plant were secured by a letter of credit from Chase, affording EPCO a lower interest rate on the bonds. Pursuant to the March 9, 2004 agreement, EPCO was required to obtain alternative financing by May 21, 2004, so that Chase could cancel the letter of credit. However, EPCO was unable to meet its obligation to obtain alternative financing.

By letter dated May 26, 2004, EPCO's Director of Administration Darrel Craft ("Craft") explained that EPCO had ben unable to refinance the Beaumont facility and sought to enter into a new agreement with Chase by "effect[ing] . . . changes to the March 9, 2004 agreement." [Doc. No. 57, Exh. B]. Craft proposed that the bond for the Beaumont facility be reamortized by extending the term from 10 years to 15 years. The May 26 letter contained an acceptance line to be signed by Broussard. He did not sign the May 26 letter.

Instead, by letter dated May 27, 2004, Broussard made a counter-offer to Craft. In the last paragraph of the letter Broussard states that "[Chase] is merely consenting to the restructuring of bonds on the terms outlined . . . , and the above 'agreement to agree' is subject to execution of definitive documentation of the transaction by the parties." [Doc. No. 57, Exh. C].

Between May 28 and June 1, 2004, Broussard and Craft had telephone conversations and exchanged emails regarding the May 27, 2004 counter-offer. In a May 28, 2004 email, Broussard stated that Chase would not agree to the reamortization requested by Craft for the Sterlington plant and would "hold to [its] offer as outlined in [its] letter." [Doc. No. 57, Exh. D].

In a June 1, 2004 email response, Craft explicitly rejected Broussard's May 27, 2004 offer

4

and stated that EPCO would start paying Chase on a 15-year amortization schedule. [Doc. No. 57, Exh. D]. On that same date, Craft sent a letter to Broussard advising him that EPCO would be wiring an interest-only payment on the Eddyville plant using a 15-year amortization schedule. Craft concluded, "[i]f we have not heard back from you by the time the wire is due, we will assume you are agreeable." [Doc. No. 57, Exh. E].

In a June 4, 2004 letter faxed to Craft, Broussard stated that EPCO rejected Chase's offer to modify the agreements and thus had "no basis to arbitrarily reduce the payments required on the Eddyville Plant financing." [Doc. No. 57, Exh. F]. Broussard noted that EPCO was already in default of "several portions of our contracts with you," but cautioned that "failure to make the required payments on the Eddyville Plant debt, or either of the other financings will result in defaults which we consider to be much more serious." [Doc. No. 57, Exh. F]. EPCO did not reduce its payments as it had indicated, but continued to make the payments called for under its loan agreements.

Finally, on July 29, 2004, Craft[5] wrote Broussard, stating that EPCO "hereby accepts Chase's offer dated May 27, 2004." [Doc. No. 57, Exh. G]. He further states that EPCO trusts that Chase would "proceed immediately to prepare the documentation necessary to effect the transaction which should include the same terms and conditions as stated in your offer letter." [Doc. No. 57, Exh. G].

On October 28, 2004, EPCO filed suit in Louisiana district court seeking specific performance of the alleged May 27, 2004 agreement, damages for breach of contract, bad faith,

---

[5]In this letter, Craft was identified as the Vice-President, CFO of EPCO. [Doc. No. 57, Exh. G].

5

and abuse of rights, and an injunction to prevent Chase from failing to renew the letters of credit. Chase timely removed the lawsuit to this Court on the basis of diversity jurisdiction.

On November 16, 2004, Chase filed a Motion to Dismiss EPCO's bad faith, abuse of rights, and breach of contract claims on the basis that EPCO failed to state a claim as a matter of law under Louisiana's Credit Agreement Statute, La. Rev. Stat. § 6:1122, et seq., which precludes actions for damages arising from oral credit agreements. The motion was referred to Magistrate Judge Mark L. Hornsby, who issued a Report and Recommendation on June 6, 2005, recommending that the motion be granted and the case dismissed. On August 15, 2005, this Court adopted the Report and Recommendation of Magistrate Judge Hornsby and dismissed the case with prejudice. EPCO appealed the dismissal.

On October 31, 2006, the Fifth Circuit Court of Appeals issued a mandate, reversing the dismissal. The Fifth Circuit found that EPCO satisfied the liberal notice-pleading standard of Federal Rule of Civil Procedure Rule 8 by alleging in its petition "that a written offer was extended to EPCO by Chase on the date of the May 2004 agreement" and that EPCO "accepted this offer." EPCO,467 F.3d at 470. The Fifth Circuit further instructed:

> EPCO has not conceded that its claim is based on an oral representation of Chase or on an unsigned agreement. Consistent with its pleadings, EPCO may be able to show that its acceptance was in the form necessary to satisfy the Credit Agreement Statute, either by submitting proof that its agreement with Chase was in a written, signed document or proof that it submitted its acceptance of Chase's offer electronically and that the two parties had agreed to conduct business electronically. Neither of these factual scenarios is foreclosed by the face of EPCO's pleadings, so dismissal at this early stage was improper.

Id. at 471. However, the Fifth Circuit expressed "no opinion as to the sufficiency of any additional showing that EPCO may be able to make or as to whether, in the event of an

6

inadequate showing, EPCO would be subject to sanctions." Id. at 471 n.6.

On November 2, 2006, Chase filed a Motion for Summary Judgment [Doc. No. 57], contending that EPCO could not meet the evidentiary burden necessary to satisfy the Credit Agreement Statute and seeking judgment as a matter of law on EPCO's claims of breach of contract, abuse of rights, and bad faith. Chase further sought summary judgment on EPCO's declaratory judgment claim regarding payment of Chase's attorneys' fees.

On December 13, 2006, over Chase's opposition, Magistrate Judge Hornsby granted EPCO leave to file its second amended complaint.

On January 5, 2007, Magistrate Judge Hornsby granted Chase leave to amend its Motion for Summary Judgment to address the new allegations raised in EPCO's Amended Complaint. On that same date, Chase filed its Amended Motion for Summary Judgment [Doc. No. 76].

On January 22, 2007, EPCO filed its own Motion for Summary Judgment [Doc. No. 77] and a Memorandum in Opposition to Chase's Motion for Summary Judgment [Doc. No. 78]. EPCO contends that there is a triable issue of material fact whether the parties entered into a contract that Chase subsequently breached. EPCO further contends that it is entitled to judgment as a matter of law on its claim that Chase was not entitled to recover attorneys' fees.

On February 2, 2007, Chase filed a Reply Memorandum in Support of its Amended Motion for Summary Judgment [Doc. No. 90].

On March 13, 2007, Chase filed a Memorandum in Opposition to EPCO's Motion for Summary Judgment [Doc. No. 91].

Briefing is now complete, and the Court is prepared to rule on the pending motions.

## II.  LAW AND ANALYSIS

### A.  Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. Topalian v. Ehrmann, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. Id. The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. Ashe v. Corley, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. Norman v. Apache Corp., 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255.

8

## B.    Breach of Contract

EPCO has asserted a breach of contract claim against Chase based on a May 27, 2004

offer letter from Broussard, a Chase Vice-President, to Craft, an agent of EPCO. EPCO asserts

that Craft accepted the May 27, 2004 offer in his July 29, 2004 letter to Broussard. Chase moves

for summary judgment on EPCO's breach of contract claim, arguing that EPCO has failed to

establish the existence of a written credit agreement between the parties.

Under Louisiana's Credit Agreement Statute, all actions based on a credit agreement are

barred unless the agreement is in writing and signed by the creditor and debtor. See La. Rev.

Stat. § 6:1121, et seq.; Jesco Constr. Corp. v. Nationsbank Corp., 830 So.2d 989, 991-92 (La.

2002). Under Louisiana's Uniform Electronic Transactions Act, La. Rev. Stat. § 9:2601, et seq.,

an electronic signature satisfies the signature requirement for most legal documents. La. Rev.

Stat. § 9:2607. However, the parties must have "agreed to conduct transactions by electronic

means." La. Rev. Stat. § 9:2605(B)(1).

> As the Fifth Circuit has explained, these two statutes, taken together,
>
> create a significant evidentiary burden for EPCO. Because it brings an action on a
> credit agreement, EPCO must prove, as an element of its claim, that there was a
> written credit agreement signed by both parties. If EPCO asserts that it submitted
> its signature electronically, it must prove that the parties agreed to conduct
> transactions by electronic means.

EPCO, 467 F.3d at 469-70. On appeal in this matter, the Fifth Circuit reversed this Court's

granting of Chase's Motion to Dismiss solely because EPCO had not "conceded [in the

Complaint] that its [breach of contract] claim is based on an oral representation of Chase or an

unsigned agreement." Id. at 471. The Fifth Circuit concluded that "EPCO may be able to show

9

that its acceptance was in the form necessary to satisfy the Credit Agreement Statute, either by submitting proof that its agreement with Chase was in a written, signed document or proof that it submitted its acceptance of Chase's offer electronically and that the two parties had agreed to conduct business electronically." Id.

Chase contends that EPCO cannot meet this burden because the May 27, 2004 letter upon which EPCO relies was not a contract, the parties did not agree to conduct transactions by electronic means, and there was no other written credit agreement signed by both parties.[6]

EPCO responds that Chase's May 27, 2004 offer was held open after EPCO's initial rejection of the offer. Therefore, EPCO's July 29, 2004 "acceptance" of the terms of the May 27, 2004 offer created a valid written contract.

Based on their arguments, the parties agree to certain pertinent facts: (1) the only potential contract at issue is the May 27, 2004 offer by Chase, (2) that offer was initially rejected by EPCO, and (3) there is no separate signed, written contract between the parties. Thus, EPCO can only prevail at trial if it can show that it properly accepted the May 27, 2004 offer and that acceptance created a signed written agreement.

EPCO cannot meet its burden in this matter. First, EPCO admits that it rejected Chase's May 27, 2004 offer. Under Louisiana law, "[a] contract is formed by the consent of the parties established through offer and acceptance."[7] La. Civ. Code art. 1927. Although it appears that the

---

[6]Although Chase, through its predecessors, had previously entered into written credit agreements with EPCO, none of those agreements provide the basis for EPCO's breach of contract claim.

[7]Four elements are necessary for the confection of a valid contract under Louisiana law: (1) capacity to contract; (2) mutual consent; (3) cause or reason for obligating themselves; and (4) a lawful purpose. See La. Civ. Code arts. 1918, 1927, 1966, 1971 and 2029. The only

May 27, 2004 communication from Broussard was an offer, or more specifically a counter-offer, that offer was admittedly rejected by Craft in a June 1, 2004 email to Broussard. It is a fundamental principle of contract law that an offer once rejected is extinguished and cannot be accepted at a later time. See Sweet v. Iberia Parish Sch. Bd., 99-483, 746 So.2d 256, 269 (La. App. 3 Cir. 11/3/99) ("Ordinarily, an offer must be accepted in 'toto; if declined it is at an end and cannot be revived by a subsequent assent.'") (citing Leaman v. Putnam, App.1923, Orleans No. 8742).

Second, EPCO has failed to show that Chase revived its May 27, 2004 offer, permitting EPCO's July 29, 2004 acceptance. The parties dispute the timing of Craft and Broussard's June 1st email correspondence, but, regardless of the time stamps on each email, both versions show that Craft **replied** to Broussard's email by explicitly rejecting the May 27, 2004 offer.[8]

Third, assuming arguendo that Chase's May 27, 2004 offer was revived on June 1st, no contract was formed because Chase withdrew the offer before acceptance. In a letter dated June 4, 2004, Broussard wrote to Craft, noting that EPCO had rejected Chase's offer to modify the contracts between the parties and thus EPCO had no basis to "arbitrarily reduce the payments required on the Eddyville plant financing." [Doc. No. 76, Exh. F]. Broussard's letter indicates

_____

element at issue here is consent.

[8]Chase has submitted an affidavit from Broussard indicating that the copy of the emails between Broussard and Craft that Chase submitted are true and correct. [Doc. No. 57]. According to that copy, Broussard forwarded an email he originally sent on May 28 to Craft on June 1st at 8:23 A.M. stating that Chase would not agree the reamortization schedule for Sterlington that Craft requested over the phone and asking Craft to let him know whether EPCO would accept the terms in the May 27, 2004 letter. Craft replied at 8:33:31 A.M. and rejected Broussard's offer. The unauthenticated version submitted by EPCO shows that Craft replied on June 1st at 7:34 A.M. to the May 28 message forwarded by Broussard on June 1st at 8:28 A.M.

11

there was no offer by Chase as of that date, no consent to contract was formed between the parties, and Broussard, on behalf of Chase, explicitly rejected EPCO's attempt to modify the parties' agreements.[9] After June 4, 2004, there clearly was no offer or counter-offer for EPCO to accept.

Fourth, any alleged contract formed on the basis of the May 27, 2004 and July 29, 2004 correspondence is not enforceable under the Credit Agreement Statute. It is undisputed that there is no written credit agreement signed by both parties in the conventional manner, nor is there a written credit agreement signed electronically. EPCO has failed to produce sufficient evidence to show that the parties had agreed to transact business electronically. While the parties had regularly engaged in negotiations electronically, they also negotiated through telephone calls and letters, and there is no indication that they had agreed to contract electronically. In each previous instance when EPCO and Chase reached an agreement to modify their financial relationship, that agreement was reduced to a written document signed by both parties.[10] At best, even if the parties had agreed to transact business electronically, there was an electronic offer by Broussard and attempted acceptance communicated by Craft in a July 29, 2004 letter, but no one document

---

[9]It appears that Craft's June 1 correspondence on behalf of EPCO constitutes a counter-offer whereby EPCO indicates its intention to reamortize the repayment of its loans. See La. Civ. Code art. 1943 ("An acceptance not in accordance with the terms of the offer is deemed to be a counteroffer."). If this was a counter-offer, it was clearly rejected by Broussard in his June 4th letter.

[10]In addition to the requirements of the Credit Agreement Statute, Louisiana contract law suggests that no contract would have been formed until a written credit agreement in the same form used by the parties in the past was signed. See La. Civ. Code art. 1947 ("When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form.").

12

...

signed electronically by the parties.[11]

EPCO has failed to raise a genuine issue of material fact for trial on its breach of contract claim, and Chase's Motion for Summary Judgment and Amended Motion for Summary Judgment on this claim are GRANTED.

## C.    Abuse of Rights and Bad Faith

EPCO asserts tort claims of abuse of rights and bad faith "based on Chase's threats and subsequent failure to renew the letters of credit with respect to the Beaumont and Sterlington facilities" when Chase allegedly knew that "its failure to renew would cause EPCO to default on [its loans with Chase] and on loans with other lenders." [Doc. No. 78, p. 18]. EPCO claims that its abuse of rights and bad faith claims stem from "the original financing documents . . . between the parties in connection with the . . . Eddyville Facility." [Doc. No. 78, p. 18]. "EPCO filed the abuse of rights and bad faith claims against Chase based on the threats made by Chase to EPCO that essentially forced EPCO to enter into a subsequent forebearance agreement (the 2003 forebearance agreement) with Chase under the original written financing documents." [Doc. No. 78, p. 19].

Chase has moved for summary judgment on EPCO's bad faith and abuse of rights claims,

---

[11]Additionally, the Court agrees with Chase that the May 27, 2004 letter was nothing more than an"'agreement to agree' . . . subject to execution of definitive documentation of the transaction by parties" and the consent of EPCO's bond holders. [Doc. No. 76, Exh. C]; see also [Doc. No. 76, Exh. G] (July 29, 2004 letter from Craft stating that Chase should "proceed immediately to prepare the documentation necessary to effect the transaction."). An "agreement to agree" without all terms and conditions included is not enforceable under the Credit Agreement Statute or general Louisiana contract law. See Bolen v. Dengel, 340 F.3d 300, 313-14 (5th Cir. 2003) ("[U]nder Louisiana law, 'the written [credit] agreement must be perfect and complete within itself.'") (citing Fleming Irr. Inc. v. Pioneer Bank & Trust Co., 661 So.2d 1035 (La. App. 2nd Cir.1995)); McNeely v. Town of Vidalia, 102 So. 422, 423 (La. 1924) ("[A]n agreement to agree is no agreement at all.").

arguing that the Louisiana Supreme Court "has concluded that the [Credit Agreement Statute] bars all causes of action by a borrower against a lender other than the breach of a written agreement regardless of theory of recovery." [Doc. No. 90, p. 2]. Chase argues further that "[i]t does not matter if the tort claims are based upon an existing or imaginary credit agreement." [Doc. No. 90, p. 2].

"The Louisiana Credit Agreement Statute precludes all actions for damages arising from **oral** credit agreements, regardless of the legal theory of recovery asserted." Jesco Const. Corp. v. Nationsbank Corp., 830 So.2d 989, 992 (La. 2002) (emphasis added). The Credit Agreement Statute has been further interpreted to preclude "all claims, including bad faith breach and bad faith acts, when predicated on the existence and enforceability of **oral** credit agreements and **implied** agreements based on the creditor's and debtor's previous relationship." King v. Parish Nat'l Bank, 885 So.2d 540, 542 (La. 2004) (emphasis added). Thus, Louisiana case law expressly prohibits a party from bringing any cause of action, tort or contract, based upon an oral or implied credit agreement. Contrary to Chase's assertion, Louisiana case law does not prohibit a party to a written credit agreement from bringing a tort cause of action based upon that written agreement.[12]

Nevertheless, the Court agrees with Chase that EPCO cannot maintain causes of action for bad faith and abuse of rights based on the actions alleged in this case. In reaching this conclusion, the Court has carefully reviewed EPCO's allegations against Chase. In paragraph 30

---

[12]While Chase may be correct in practice, its precise statement of the law is incorrect. At least in theory, there may be a tort claim available if it is properly based upon a written credit agreement. However, the Court need not reach this issue to resolve the pending motions for summary judgment.

14

of its Petition, EPCO explains that Chase acted in "bad faith" by "refusing to renew" its Letter of

Credit for EPCO's Beaumont and Eddyville facilities. [Doc. No. 1, ¶ 30]. In paragraph 31 of the

Petition, EPCO cites the following actions by Chase as constituting abuse of rights:

1.  [Chase] is exercising its rights under the Reimbursement Agreement with a predominant motive to harm EPCO;

2.  There exist no serious or legitimate interests of [Chase] to exercise its rights in this regard as EPCO has never been in default on any payment, and [Chase] is well secured with respect to the indebtedness;

3.  The exercise of Chase's rights are in violation of moral rules, good faith and elementary fairness; and

4.  [Chase] is exercising its rights solely for the purpose of forcing EPCO to pay attorneys' fees that it is not otherwise obligated to pay; therefore, such rights are being exercised for a purpose other than that for which they were granted under the Reimbursement Agreement or any other agreement with EPCO.

[Doc. No. 1, ¶ 31].

While EPCO links its tort claims to its previous written agreements with Chase, it has in

actuality brought an action for abuse of rights and bad faith based upon the parties' previous

relationship and oral negotiations. Under the Louisiana Supreme Court's decision in King, this is

the type of impermissible "implied agreement" prohibited under the Credit Agreement Statute.

EPCO has not pointed to any provision in their prior written agreements under which Chase was

required to renew the letters of credit for Beaumont or Eddyville, nor was there any provision

preventing Chase from renegotiating with EPCO for whatever reason it chose. If the Court were

to permit EPCO to proceed with its claims, then it could prevail on the basis that it had an

implied agreement with Chase that Chase would continue to finance EPCO's endeavors, no

matter the terms of their agreement, as long as EPCO made its payments in a timely manner.

Under these circumstances, the Court finds that EPCO cannot maintain abuse of rights and bad faith claims against Chase as a matter of law, and Chase's Motion for Summary Judgment and Amended Motion for Summary Judgment on these claims are also GRANTED.

### D.    Payment of Attorneys' Fees

EPCO seeks a declaratory judgment that it is not liable for attorney's fees to Chase incurred since March 2003 when Chase had its attorneys participate in "work-out discussions, although at no time were any enforcements or other remedies invoked under such agreements." [Doc. No. 1, ¶ 23; see also Doc. No. 1, ¶ 26]. EPCO asks the Court to order the return of the $50,000.00 in payments made to Chase for attorney's fees and a declaratory judgment that it is not liable for an additional $18,476.93 in attorney's fees and expenses of $2,102.82.

Chase has filed a Motion for Summary Judgment, contending that it is entitled to payment of attorney's fees "incurred in connection with enforcing its rights under the Business Loan Agreement, Reimbursement Agreement, the Commercial Loan and Security Agreements, and the Note and Related Documents." [Doc. No. 57, Statement of Material Facts, ¶ 12]. EPCO has also filed a Motion for Summary Judgment on this issue, contending that the contractual provisions cited by Chase do not entitle it to payment of attorneys' fees under the facts in this case.

In Louisiana, attorneys' fees are not recoverable unless expressly provided for by statute or contract. See Rivet v. State, 680 So.2d 1154 (La. 1996); State, DOTD v. Williamson, 597 So.2d 439, 441 (La. 1992). It is undisputed that there is no statutory authority for an award of attorneys' fees.[13] Therefore, Chase may obtain payment of its attorneys' fees by EPCO only if

---

[13]Although Chase cites to Louisiana Civil Code article 2000, this Code article merely permits parties to enter into valid contracts for attorneys' fees and codifies how interest should be calculated on sums of money owed under this type of agreement. See La. Civ. Code art. 2000

16

the attorneys' fees are expressly provided for in the agreements between the parties. Any such

"stipulation for attorney's fees will be enforced in strict accordance with the terms of the

particular provision." Lagarde Finance Co. v. Vinet, 346 F.2d 846, 851 (5th Cir. 1965); see also

Ansley and Montgomery v. Pailet, No. 4585, Teiss. 93, 1909 WL 1488 at *2 (La. App. Orleans

1909), 6 Orleans App. 93 ("The court will follow the strict terms of the stipulation of the note,

and will look to the evidence to ascertain if under it the condition has happened on which the

debtor was to become liable for the creditor's attorneys' fees. This is not a matter of general law,

but one of special law which the parties have made for themselves and embodied in the

phraseology of their contract.") (internal quotation marks and quotation omitted).

    To determine whether EPCO was contractually obligated to pay Chase's attorneys' fees,

the Court has reviewed the six (6) agreements between the parties cited by Chase as authority for

its claim for attorneys' fees. Those agreements and their relevant provisions are as follows:

**(1)    August 29, 1996 Commercial Loan and Security Agreement**

> The Borrower hereby agrees to pay Lender on demand: (a) all costs and expenses
> incurred by the Lender in connection with the preparation, negotiation and
> execution of this Agreement and the other Loan Documents and any and all
> amendments, modification, renewals, extensions and supplements thereof and
> thereto, including without limitation, the fees (up to a maximum of $2500.00) and
> expenses of the Lender's legal counsel, (b) all costs and expenses incurred by the
> Lender in the enforcement of this Agreement and Lender's legal counsel . . .

[Doc. No. 57, Exh. C, p. 23].

---

("When the object of the performance is a sum of money, damages for delay in performance are
measured by the interest on that sum from the time it is due, at the rate agreed by the parties or,
in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500. The obligee may
recover these damages without having to prove any loss, and whatever loss he may have suffered
he can recover no more. If the parties, by written contract, have expressly agreed that the obligor
shall also be liable for the obligee's attorney fees in a fixed or determinable amount, the obligee
is entitled to that amount as well.").

(2)    **December 10, 1998[14] Application and Agreement for Irrevocable Standby Letter of Credit**

Applicant agrees to pay Issuer: (a) on demand, Issuer's customary commissions and fees in effect from time to time and all costs and expenses, including reasonable attorney's fees paid or incurred by Issuer in connection with the administration or enforcement of this Agreement or the credit, and any adviser, confirmer, or other nominated person's fees and costs that are chargeable to or paid by Issuer.

[Doc. No. 57, Exh. F].

(3)    **March 23, 1999 and December 21, 2000 Promissory Notes**

If Lender [Chase] refers this note to an attorney for collection, or files suit against Borrower to collect this Note, or if Borrower files for bankruptcy or other relief from creditors, Borrower agrees to pay Lender's reasonable attorneys' fees in an amount equal to 25.000% of the unpaid debt then owing under this Note.

[Doc. No. 57, Exhs. D & E].

(4)    **March 23, 1999 Commercial Security Agreement**

Attorneys' Fees; Expenses. Grantor will upon demand pay to Lender the amount of any and all costs and expenses (including without limitation, reasonable attorneys' fees and expenses) which Lender may incur in connection with (I) the perfection and preservation of the collateral assignment and security interests created under this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral, (iii) the exercise or enforcement of any of the rights of Lender under this Agreement, or (iv) the failure by Grantor to perform or observe any of the provisions hereof.

[Doc. No. 57, Exh. I, p. 6].

(5)    **June 28, 2001 Business Loan Agreement**

Borrower [ EPCO] agrees to pay upon demand all of Lender's [Chase's] expenses,

---

[14]In Chase's memorandum in support of its Motion for Summary Judgment, this document is identified as being dated "November 8, 2000." [Doc. No. 57, p. 10]. However, Exhibit F is clearly dated December 10, 1998. It is unclear why the date of November 8, 2000, was used, and the Court will refer to the document by the date indicated on the document itself.

including attorneys' fees incurred in connection with the preparation, execution,
enforcement, modification and collection of this Agreement or in connection with
the Loans made pursuant to this Agreement.  Lender may hire one or more
attorneys to help collect the indebtedness if Borrower does not pay, and Borrower
will pay Lender's reasonable attorneys' fees.

[Doc. No. 57, Exh. B, p. 5].

### (6)    December 1, 2002 Reimbursement Agreement

The Borrower [EPCO] agrees to pay to the Bank [Chase] on demand: . . .
(f) to the extent permitted by law, all out-of-pocket expenses reasonably incurred
by the Bank in enforcing any of its rights under the [Reimbursement] Agreement,
the Borrower Documents, the Related Documents and all other instruments
executed by the Borrower in connection therewith, including, without limitation,
any reasonable fees, expenses or charges of any nature incurred by the Bank in
connection with the enforcement of its rights under the Pledge and Security
Agreement.

[Doc. No. 57, Exh. A, pp. 11-12].

First, the Court addresses the attorneys' fees provisions in the March 23, 1999 and

December 21, 2000 Promissory Notes.  In their reply memorandum, "[f]or purposes of argument,

Chase assumes that the attorney's fees provisions in [these Notes] . . . may not be enforceable to

the extent that the notes themselves were not in default." [Doc. No. 90, p. 7].  Chase is correct to

"assume" that these provisions are not enforceable because there is no dispute that the Notes

were not referred for collection, Chase did not have to file suit to collect on the Notes, and EPCO

did not file for bankruptcy or other relief from creditors.  In fact, it is undisputed that EPCO

never failed to make its payments in a timely manner.  Therefore, Chase cannot collect attorneys'

fees from EPCO on the basis of these Notes.

Second, Chase cannot recover attorneys' fees on the basis of the December 10, 1998

Application and Agreement for Irrevocable Standby Letter of Credit because that agreement

19

expired on December 31, 1999.[15] Thus, regardless of the language used, this agreement cannot serve as the basis for payment of attorneys' fees incurred in 2003 and later.

Third, the August 29, 1996 Commercial Loan and Security Agreement appears to limit attorneys' fees to a maximum of $2500.00 if those fees were "incurred by the Lender in connection with the preparation, negotiation and execution of this Agreement and the other Loan Documents and any and all amendments, modification, renewals, extensions and supplements." Although no limit was placed on the costs and expenses incurred by Chase or its attorneys in the **enforcement** of this Agreement, it is at least arguable that Chase's attorneys' fees were incurred under the first prong. The Court finds that there is at least an issue of material fact as to whether the negotiations and transactions in this case would limit Chase to a recovery of $2,500.00.

The remaining financial documents contain attorneys' fees provisions which are not limited to collection efforts, expired on their face, or capped at a certain amount. While Chase contends that each of these provisions permit it to recover attorneys' fees, Chase relies primarily on the June 28, 2001 Business Loan Agreement [Doc. No. 57, Exh. B]. The Business Loan Agreement "governs all loans, credit facilities and/or other financial accommodations described [in the Agreement] and, unless otherwise agreed to in writing . . . .all other present and future loans, credit facilities and other financial accommodations provided by [Chase to EPCO]." [Doc. No. 57, Exh. B, p. 1]. Chase points out that the March 19, 2003 Forebearance Agreement [Doc. No. 57, Exh. H] entered into by the parties specifically refers to the June 2001 Business Loan Agreement and its amendments. EPCO admits in the Forebearance Agreement that "it is

---

[15]EPCO points to the expiration date in its memorandum, and Chase has not responded to that argument. [Doc. No. 77, p. 15]. Therefore, the Court can only assume that this fact is undisputed, at least for purposes of summary judgment.

currently not in compliance with the Debt Service Coverage Ratio (as reflected in the year-end

financial statements dated September 30, 2002) under the terms and condition of the Business

Loan Agreement . . . and was late in its interim financial reporting obligations for the first quarter

ending December 31, 2002." [Doc. No. 57, Exh. H, p. 2]. Further, in his affidavit, Broussard

states that Chase "sought legal assistance and advice from attorneys with Taylor, Porter, Brooks,

Phillips LLP to protect its rights and interests in connection with the EPCO loans and related

rights and agreements." [Doc. No. 57, p. 30].

Given EPCO's written admission, Broussard's affidavit, and after application of the plain

language of the Business Loan Agreement, the Court finds that Chase was and is entitled to

recover "attorneys' fees incurred in connection with the preparation, execution, enforcement,

modification and collection of the" Business Loan Agreement, including those negotiations

resulting in the March 19, 2003 Forebearance Agreement.

After the parties entered into the Forebearance Agreement, the parties continued to

negotiate modifications to the Business Loan Agreement and the loans made pursuant to that

agreement, at least until July 29, 2004, when EPCO attempted to accept Chase's previous offer

of a modification to their agreements. Under the broad language of the Business Loan

Agreement attorneys' fees provision, the Court finds that Chase may also recover attorneys' fees

from EPCO for these negotiations.

Finally, the Court finds that Chase incurred attorneys' fees in this lawsuit because of

EPCO's attempt to unilaterally modify its Business Loan Agreement and loans with Chase.

Accordingly, Chase is also entitled to attorneys' fees incurred in defense of this lawsuit.

Having determined that Chase is entitled to obtain payment of its attorneys' fees under

21

the Business Loan Agreement, the Court need not reach the additional agreements relied upon by Chase.

However, the Court's duty is not at an end. Even if attorney fees are stipulated in a contract, as they are in this case, and notwithstanding Louisiana Civil Code article 2000, courts may inquire into the reasonableness of the fee. See Central Progressive Bank v. Bradley, 502 So.2d 1017 (La.1987).

Therefore, if EPCO contends that Chase's attorneys' fees are excessive or unreasonable, the Court ORDERS that EPCO file a memorandum on this issue no later than May 22, 2007, by 5:00 P.M. If Chase wishes to file a memorandum in response, it must do so no later then June 6, 2007, by 5:00 P.M. The Court will then review the memoranda and take appropriate action.

III.    CONCLUSION

For the foregoing reasons, Chase's Motion for Summary Judgment and Amended Motion for Summary Judgment  [Doc. Nos. 57 & 76] are GRANTED, and EPCO's Motion for Summary Judgment [Doc. No. 77] is DENIED. However, if EPCO contends that Chase's attorneys' fees are unreasonable or excessive, the parties may brief the issue for further consideration by the Court under the schedule set forth above.

MONROE, LOUISIANA, this _____8_____ day of _____May_____, 2007.


                                        _____
                                        ROBERT G. JAMES
                                        UNITED STATES DISTRICT JUDGE